# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**Pheenix USH LLC,**
*doing business as* Spin,

      **Plaintiff,**

    **v.**

**City of Columbus,** *et al.,*

      **Defendants.**

**Case No. 2:24-cv-4290**

**Judge Michael H. Watson**

**Magistrate Judge Vascura**

## OPINION AND ORDER

This is a disappointed bidder case. At the end of a competitive bidding process, the City of Columbus ("City") awarded Veo an exclusive license to conduct its micromobility[1] business. During that same process, the City rejected Plaintiff Spin's proposal. Spin must cease its micromobility operations in Columbus after December 31, 2024. Disappointed with the outcome and the process, Spin sued the City. Spin now moves for a temporary restraining order ("TRO"). For the reasons discussed below, the Court **GRANTS** Spin's TRO motion.

---

[1] Best exemplified by e-scooters, micromobility refers to a class of vehicles that are small, lightweight, personally driven, and often publicly shared on a rental or subscription basis for short distance travel. *See* Compl. 1, ECF No. 9 at PAGEID # 91; *id.* at PAGEID # 128.

# I.  BACKGROUND

## A.  Columbus's Current Micromobility Program

Overseen by the City's Department of Public Service ("Department"), micromobility in Columbus consists of two primary elements: (1) the CoGo Bike Share system, and (2) the Shared Mobility Device ("SMD") program.  *See* Compl. Ex. A ("RFP") § 1.2.1, ECF No. 9-1 at PAGEID # 118.

CoGo provides bikes at docking stations throughout Columbus.  *Id.* § 1.3.1, PAGEID # 120–21.  The City established CoGo in 2013, and it has grown to offer 550 bicycles at 91 docking stations (comprising 1,317 docks).  *Id.* CoGo is publicly-owned, meaning the City owns all bikes, docking stations, and related assets.  *Id.*  Though the City owns the equipment, it contracts operations out to Lyft Bikes & Scooters .  *Id.*  The City extended Lyft's contract through the term of the at-issue procurement process.  *Id.*  In 2023, CoGo bikes made 65,332 trips, covering 109,005 miles.  *Id.* § 1.3.3 Table 1, PAGEID # 122.

Whereas the CoGo system provides docked bikes, the SMD program provides dockless devices, especially e-scooters.  *Id.* § 1.3.2, PAGEID # 121–22. The City established the SMD program in 2018.  *Id.*  Now, there are 5,000 e-scooters in Columbus.  *Id.* § 1.3.3 Table 2, PAGEID # 123.  In 2023, SMDs made 912,215 trips, covering about as many miles.  *Id.* Table 3.

Also, unlike CoGo, the SMD program is not publicly owned; that is, the City does not own any e-scooters.  *Id.* § 1.3.2, PAGEID # 121–22.  Rather, the City

extends permits[2] to vendors, who own e-scooters.  *Id.*  Each vendor must annually pay all permit fees and a per device fee of $90.  *Id.*  There are three SMD vendors actively operating within the City.  *Id.*

Spin is one of those vendors.  Compl. ¶ 14, ECF No. 9 at PAGEID # 94. Spin requested and obtained a license and permit to operate in Columbus as early as 2019.  *Id.*  Spin has continuously operated in Columbus since then; the City has regularly renewed Spin's permission to conduct its SMD business.  *Id.* ¶ 15.  Spin operates around 1,750 of the 5,000 e-scooters in Columbus.  RFP § 1.3.3 Table 2, ECF No. 9-1 at PAGEID # 123.

Each of the three current SMD vendor's permits (including Spin's) will expire by January 1, 2024.  *See* Compl. ¶¶ 61, 62, ECF No. 9 at PAGEID # 99.

## B.  Columbus's New Micromobility Program

### 1.  Request for Proposals

Earlier this year, the Department issued an RFP for the Columbus and Central Ohio Shared Mobility Program.  *See generally* RFP, ECF No. 9-1.  The RFP invited proposals from vendors to manage, operate, and expand the City's micromobility system.  *Id.* § 1.2.1., PAGEID # 118–19.  The Department would select "one or more" vendors to operate micromobility in Columbus for at least 3 (and up to 5) years, starting on January 1, 2025.  *Id.*; *see also id.* § 1.6.  Spin and

---

[2] Vendors wishing to operate their e-scooter business in Columbus within the public right-of-way must obtain a 904 Right-of-Way Lease and a 903 Occupancy Permit to legally operate in the City.  RFP § 1.3.2, ECF No. 9-1 at PAGEID # 121–22.

five other companies submitted a bid.  Compl. ¶¶ 23, 24, ECF No. 9 at

PAGEID # 95.

### 2.    Evaluation Process

All bids were reviewed by an appointed Evaluation Committee

("Committee").  The Committee was to evaluate all proposals based on nine

criteria weighted with a point system.  *See* RFP § 6.4, ECF No. 9-1 at PAGEID

# 136.  The RFP specified that the Committee shall award points as follows:

- Up to 10 points for the project team's qualification and experience. *Id.* § 7.1, PAGEID # 140.
- Up to 10 points for the project manager's experience and availability. *Id.* § 7.2.
- Up to 10 points for past performance in Columbus or other cities.  *Id.* § 7.3.
- And up to 70 points for understanding of the project and how the bidder's team will successfully execute, *id.* § 7.4, PAGEID #141, further broken down as follows:
  - Up to 20 points for offering a diverse range of devices or features, satisfying the requirements detailed in the RFP.  *Id.* § 7.4.1.
  - Up to 15 points for a demonstrated ability and commitment to address concerns with SMD parking and user compliance.  *Id.* § 7.4.2.
  - Up to 15 points for a financial plan.  *Id.* § 7.4.3, PAGEID # 142.
  - Up to 10 points for a demonstrated commitment to customer service. *Id.* § 7.4.4.
  - Up to 5 points for a demonstrated commitment to reduce greenhouse gas emissions and to achieve Columbus Climate Action Plan goals. *Id.* § 7.4.5.
  - And up to 5 points for a demonstrated commitment to advancing equitable access to mobility.  *Id.* § 7.4.6.

Under this rubric, Spin scored 87.6 points, placing it third, 3.4 points behind second-place Veo. Compl. ¶ 31, ECF No. 9 at PAGEID # 95; Resp. Ex. A ("Goodwin Aff") ¶ 4, ECF No. 14-1 at PAGEID # 170.

Bidders might have qualified for additional points based on their response to the Location of Lead Offeror Form ("LLO Form"), which was required to submit a bid. RFP § 6.5.3, ECF No. 9-1 at PAGEID # 137. The LLO Form states it "will be used to determine the scoring for the location of the lead offeror per Evaluation Criteria Section 7.1 of this [RFP]." Compl. Ex. A, ECF No. 9-1 at PAGEID # 115 ("LLO Form"). The LLO Form then directs bidders to check a box corresponding to 10, 7, 5, 3, or 1 point(s) based on where the bidder is located. *Id.* Spin checked the box corresponding to 7 points and represents that Veo checked the box corresponding to 3 points. Compl. ¶¶ 34, 35, ECF No. 9 at PAGEID # 96. If awarded those points, Spin argues, it would have more total points than Veo. *Id.* ¶ 36.

The Committee held "additional discussions" with the three highest-scoring bidders, which included a presentation, product demonstration, and interview. *See* RFP § 8, ECF No. 9-1 at PAGEID # 144; Goodwin Aff ¶ 4, ECF No. 14-1 at PAGEID # 170. Based on the "additional discussions" with the offerors, the Committee re-ranked the remaining bids using the same evaluation criteria specified in RFP Section 7. Goodwin Aff ¶ 5, ECF No. 14-1 at PAGEID # 171. In the Committee's new ranking, Spin jumped up to second place, but Veo occupied the top spot. *Id.*

The Committee submitted its new ranking along with a written explanation to the Director of the Department. *Id.* The Committee recommended that Veo operate the City's micromobility program. *Id.* The Committee also recommended against contracting with multiple vendors. *Id.*

### 3. The City awards an Exclusive Contract to Veo.

The Director, consistent with the "discretion" afforded to her according to the RFP, then selected Veo and no other bidder. RFP § 8, ECF No. 9-1 at PAGEID # 144. The Director and Veo negotiated a contract, which the Columbus City Council approved by ordinance on December 11, 2024. *See* Resp. Ex. A-1 ("Ordinance"), ECF No. 14-1 at PAGEID # 173–75. The Ordinance notes that "Veo received the highest score from the Evaluation Committee." *Id.* at PAGEID #173.

### 4. The City declines to reconsider; Spin files suit.

In parallel, Spin sought the Department's reconsideration. Spin raised evaluation process concerns (the same concerns it raises in this lawsuit) in both a letter to and a meeting with Department officials. Compl. ¶¶ 48–53, ECF No. 9 at PAGEID # 98. Spin asked the Department to allow Spin to continue operating alongside Veo after January 1, 2025, pending a resolution of the evaluation process issues. *Id.* The Department refused, formally declining on December 13, 2024, to allow Spin to continue operating. Compl. Ex. B, ECF No. 9-1. Six days later, Spin filed this lawsuit. Now, Spin moves this Court for a TRO that would enjoin the City from contracting exclusively with Veo and from compelling

Spin to cease its operations at the end of its permit term. *See generally* Mot., ECF No. 3.

## II.   LEGAL STANDARD

A TRO is an extraordinary, emergency measure. *Hacker v. Fed. Bureau of Prisons*, 450 F. Supp. 2d 705, 710 (E.D. Mich. 2006). A Court should issue a TRO only if the movant carries its burden of proving that the circumstances "clearly" demand it. *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *see also NetChoice, LLC v. Yost*, 711 F. Supp. 3d 844, 852 (S.D. Ohio 2024); Fed. R. Civ. P. 65(b)(1)(A).

Courts evaluate whether the circumstances "clearly" demand a TRO according to the traditional preliminary injunction ("PI") factors:

> (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.

*City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (per curiam) (en banc) (internal citations and quotations omitted). The PI and TRO standards are not, however, identical.

Relative to the PI standard, the TRO standard affords greater weight to "irreparable injury." *See NetChoice,* 711 F. Supp. 3d at 852 (describing immediate, irreparable harm as "paramount" to the TRO inquiry); *Doe v. Univ. of Cincinnati*, No. 1:15-cv-600, 2015 WL 5729328, at *1 (S.D. Ohio Sept. 30, 2015) ("The standard for issuing a temporary restraining order is logically the same as

for a preliminary injunction with emphasis, however, on irreparable harm[.]"
(internal citations and quotations omitted)); *Motor Vehicle Bd. of Calif. v. Fox*, 434
U.S. 1345, 1347 n.2 (1977)). Thus, the likelihood-of-success prong is not
dispositive; "serious questions going to the merits" may be enough. *Dates v.
HSBC*, 721 F. Supp. 3d 616, 624 (S.D. Ohio 2024) (citing *Frisch's Rest., Inc. v.
Shoney's Inc.*, 759 F.2d 1261, 1270 (6th Cir. 1985)). But "serious questions"
suffice only if the movant faces immediate, irreparable harm that "decidedly
outweighs" any harm a TRO might impose on the non-movant. *See id.*

## III.     ANALYSIS

**A.     Spin Raises "Serious Questions Going to the Merits" of Whether the
City Violated Competitive Bidding Law in Rejecting Spin's Bid.**

Spin primarily alleges that the City violated state and local law governing
competitive bids. *See* Mot. 8–9, ECF No. 3 at PAGEID # 70–71. Spin protests
both the evaluation process and its outcome. On the process, Spin argues that
the City considered unannounced criteria (affiliated companies' past performance
and past corporate restructuring) and disregarded announced criteria (points
promised on the LLO Form). On the outcome, Spin boasts that its bid was the
best, simply put.

The City responds by invoking its "wide discretion" to award municipal
contracts. *See* Resp. 4–8, ECF No. 14 at PAGEID # 161–65. It goes so far as to
assert that competitive bidding law does not bridle the City's discretion here. *Id.*
at 5–6, PAGEID # 162–63. Competitive bidding law applies only when the City

"procures" or "purchases" some good or service, the City contends. *Id.* (citing *Indep. Taxicab Ass'n v. Columbus Green Cabs, Inc.*, 616 N.E.2d 1144 (Ohio Ct. App. 1992)). The City did not "procure" or "purchase" anything here, in its view, because the City merely issued a license to and agreed to share revenue with Veo. *See* Resp. Ex. A ¶ 7; ECF No. 14-1 at PAGEID # 171, 173–75. Therefore, on the City's theory, competitive bidding law imposes no limit on its discretion to deny Spin's bid. And even if it did impose a limit, the City stayed within that limit, it asserts, by complying with the process outlined in the RFP. *See* Resp. 7, ECF No. 14 at PAGEID # 164. So, the City instructs, this Court should not interfere with its exercise of discretion.

The Court begins its analysis by resolving whether state and local competitive bidding law applies to the City's rejection of Spin's bid. Finding that it likely does apply, the Court then asks whether the City "abused its discretion" by denying Spin's bid. The Court concludes that Spin raises "serious questions going to the merits" of that issue, but the Court stops short of concluding that Spin will "likely" prevail.

### 1. Competitive bidding laws—Columbus Code of Ordinances Section 329.18 and Ohio Revised Code Section 735.05—govern here, per the express terms of the RFP.

The RFP incorporates state and local law on competitive bidding with either of two key provisions. The "Terms and Conditions" attached to the RFP contain a term titled "APPLICABLE LAWS[,]" which states:

> The Revised Code of the State of Ohio, the Charter of the City of Columbus, and all City ordinances insofar as they apply to the laws of competitive bidding, contracts, purchases, and wage theft prevention, are made a part thereof.

Compl. Ex. A, ECF No. 9-1 at PAGEID # 116. And Section 6.4 of the RFP, titled "Evaluation," states:

> Proposals will be evaluated . . . in accordance with Columbus City Code, Title 3, Chapter 329.

RFP § 6.4, ECF No. 9-1 at PAGEID # 136.

If the City wanted to inform potential bidders that competitive bidding law would apply to their bids, it hardly could have been more explicit.

Yet the City maintains that competitive bidding law does not apply to the at-issue RFP because competitive bidding laws bind it in the competitive procurement context only. For this premise, the City relies on *Green Cabs*. In *Green Cabs*, the Ohio Supreme Court held that Columbus need not have complied with competitive bidding law in awarding a contract to a taxicab company to do business at the airport. 616 N.E.2d at 1149–50. Ohio's high court reasoned that competitive bidding law did not apply because Columbus granted the taxicab company a license, not a procurement contract. *Id.* This rationale applies here too, the City argues, because Spin and Veo are vying for a license to do business, not a procurement contract. Building off the *Green Cab* default (competitive bidding laws do not apply to license awards), the City avers that the RFP's references to competitive bidding law do "not transform this process into a competitive procurement." Resp. 5 n. 1, ECF No. 14 at

PAGEID # 162. Rather, the City construes all references to competitive bidding law in the RFP as a mere nonbinding "guide." *Id.*

To the contrary, the RFP does not merely refer to competitive bidding law as a guide. The RFP explicitly makes "the laws of competitive bidding . . . a part thereof," Compl. Ex. A, ECF No. 9-1 at PAGEID # 116, and promises to evaluate bids "in accordance with Columbus City Code, Title 3, Chapter 329[,]" a competitive bidding law. RFP § 6.4, ECF No. 9-1 at PAGEID # 136. Public entities must follow the terms they set for themselves in an RFP. *See, e.g., JG City LLC v. State Bd. of Pharm.*, 183 N.E.3d 522, 531 (Ohio App. 10th Dist. 2021); *Danis Clarkco Landfill Co. v. Clark Cty. Solid Waste Mgt. Dist.*, 653 N.E.2d 646, 658 (Ohio 1995)). A municipality may thus bind itself to obey the strictures of competitive bidding law, even if it would not otherwise be required to do so. *See, e.g., Speed Way Transp., LLC v. Gahanna*, 2021 WL 5984938, at *5 (Ohio App. 10 Dist., 2021). The City has done so here, with its term on "applicable laws" and with RFP Section 6.4.

That municipalities must follow the terms of their own RFPs is one instance of a more fundamental principle: "[i]f men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them." *Niz-Chavez v. Garland*, 593 U.S. 155, 172 (2021). The Court sees nothing square about the corner the City turned in arguing that competitive bidding law does not apply despite express statements

in its RFP that it does.  And so, in view of Ohio law and this square-corners principle, the Court rejects the City's argument.

In sum, the Court finds that competitive bidding law likely applies to the City's consideration of Spin's bid.  The Court now applies that body of law.

### 2. The City's alleged consideration of unannounced criteria and disregard of announced criteria present "serious questions going to" the City's "abuse of discretion."

The RFP adopts Columbus Code Chapter 329.  Section 18 of that Chapter governs the competitive bidding process for public contracts and requires the City to award the contract to the "lowest, responsive, responsible, and best bidder."  Ohio law imposes a similar standard.  Ohio Rev. Code § 735.05 ("lowest and best").

The "lowest, responsive, responsible, and best bidder" standard is well-defined by the Columbus Code and Ohio case law.  The "best bidder" is the one "who, considering all relevant factors set forth in this chapter, will be, on the whole, best for the public."  Columbus Code § 329.01(a).  A "responsible" bidder is one "who has the capability and capacity in all respects to fully perform the contract requirements and whose experience, integrity and reliability will assure good faith performance."  *Id.* (hh).  A "responsive" bidder is one "who has submitted a bid which conforms in material respects to the requirements set forth in an invitation for bids."  *Id.* (ll).  The Columbus Code leaves "lowest" undefined, but as interpreted by Ohio courts, "best" subsumes "lowest."  *See, e.g., Altschul v. City of Springfield*, 193 N.E. 788, 790 (Ohio App. 2d Dist. 1933) ("[W]hen the

statute provides for the acceptance of the lowest and best bid[,] the city is not limited to an acceptance of merely the lowest dollar bid.").

Spin alleges that it submitted the lowest, responsive, responsible, and best bid. Compl. ¶ 17, ECF No. 1 at PAGEID # 11. Spin focuses on "lowest" and "best."[3] Spin dubs itself the "lowest bidder" because it offered: an initial-infrastructure fee nine times greater than Veo's, a per-ride fee that would deliver $290,000 more in revenue per year than Veo, and a per-vehicle fee matching Veo's. Supplementing these quantitative factors with qualitative ones, Spin asserts it was the "best bidder" because: Spin would have received 94.6 points to Veo's 94 if the City counted the points on the LLO Form, and Spin offered to meet the City's preferences on fleet size and device composition.

The City disagrees. Why? The Court does not know. The City withholds any explanation of what makes Veo the lowest and best bidder, aside from oblique references to customer complaints about Spin.[4] As for why it chose only one vendor, the City rests on Spin's opinion that an exclusive partnership would be most effective. Resp. 3, ECF No. 14 at PAGEID # 160. All in all, instead of

---

[3] Spin's Complaint recites that its proposal passes the "responsive" and "responsible" thresholds. Compl. ¶¶ 75, 76, ECF No. 1 at PAGEID # 11–12. The City concedes that Spin's bid was "responsive." *See* Ordinance, ECF No. 14-1 at PAGEID # 173. And given that Spin's relative standing improved after being invited to interview, the City would presumably also concede that Spin's bid was responsible.

[4] Resp. 10, ECF No. 14 at PAGEID # 167; *id.* Ex. A ¶ 6, ECF No. 14-1 at PAGEID # 171.

its own reasoning, the City relies on its "wide discretion" which, it warns, "[t]his Court should . . . not interfere with." *Id.* at 7, PAGEID # 164.

The City is correct about its discretion, to be sure. Courts should not "substitute their judgment for that of public officials in determining which party is the lowest and best bidder for a public contract." *State ex rel. Boccuzzi v. Cuyahoga Cty. Bd. of Comm'rs*, 860 N.E.2d 749, 753 (Ohio 2007). Nor should courts disturb a public official's determination that one vendor would be better than multiple at providing a public service.[5] In short, courts should presume that public officials make the right determinations, giving them the benefit of any doubt. *See Boccuzzi*, 860 N.E.2d at 753. Though troubled by the City's lack of explanation,[6] the Court will accordingly give it the benefit of the doubt here.

But the City's discretion is not the end of the matter. That discretion is neither "unlimited nor unbridled." *City of Dayton ex rel. Scandrick v. McGee*, 423 N.E.2d 1095, 1098 (Ohio 1981). A court should interfere with the award of a

---

[5] Spin alleges a violation of the Sherman Antitrust Act, 15 U.S.C. § 2, in addition to its competitive bidding law claim. Compl. ¶¶ 100–108, ECF No. 9 at PAGEID 105–107. Aside from a paragraph about the public interest in preventing monopolization, Mot. 11–12, ECF No. 3 at PAGEID # 73–74, Spin's TRO motion does not mention its antitrust claim. To be complete, the Court doubts Spin's anti-trust claim would succeed on the merits. The City is likely immune to that claim under the "state action exemption" because it acted pursuant to Ohio Revised Code § 735.05, which "contemplates the kind of action complained of" here. *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 44 (1985); *see also id.* at 38–40.

[6] *Cf. Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019) ("The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public."); Benjamin Eidelson, *Reasoned Explanation and Political Accountability in the Roberts Court*, 130 YALE L.J. 1748 (2021).

public contract if it finds the city "abused its discretion." *See, e.g., id.* at 1097. A city abuses its discretion if it awards a contract "arbitrarily," meaning "'without adequate determining principle; . . . not governed by any fixed rules or standard.'" *Id.* (quoting Black's Law Dictionary (5 Ed.)). Rejecting a bid based on unannounced criteria may be arbitrary enough to constitute an abuse of discretion. *See id.* The converse is also true: if a city fails to apply an announced evaluation criterion, that too may be arbitrary enough to constitute an abuse of discretion. *See State ex rel. Associated Builders & Contrs. of Cent. Ohio v. Franklin Cty. Bd. of Comm'rs*, 926 N.E.2d 600, 606 (Ohio 2010).

Spin alleges that the City considered unannounced evaluation criteria. Spin represents that, in evaluating its bid, the City considered Bird's past performance in Dublin, Ohio. Although Spin and Bird are affiliated (neither party explains how), the two companies are distinct and operate separately, according to Spin. Compl. ¶¶ 37–39; ECF No. 1 at PAGEID # 6. Spin also represents that, in evaluating its bid, the City considered "past corporate restructuring issues." *Id.* ¶ 40 Because it considered these unannounced evaluation criteria, Spin asserts the City's evaluation of its bid was arbitrary and an abuse of discretion.

Spin's allegations that the City considered unannounced evaluation criteria raise serious questions about the City's abuse of discretion. The allegations that the City considered Bird's past performance and Spin's past restructuring are factually plausible; the City has not yet denied either. And both criteria are

indeed "unannounced": Section 7 of the RFP does not list either as their own criterion, nor could either be read into any criterion included in Section 7 (at least not easily).[7] Again, considering an unannounced criterion may be sufficiently arbitrary to constitute an "abuse of discretion" under Ohio law calling for court intervention. *See Scandrick*, 423 N.E.2d at 1097. So, the Court concludes, Spin's allegations that the City considered Bird's past performance and Spin's past restructuring raise a "serious question going to the merits."

Spin also alleges that the City disregarded an announced criterion. Spin characterizes the LLO Form as a neglected criterion. The City denies this characterization, calling Spin's LLO Form argument a "red herring." Resp. 8, ECF No. 14 at PAGEID # 165. A vendor's location factors in, on the City's view, at RFP Sections 2.1 and 7.1 only. Taking those sections together, the City reads them as merely requiring bidders to commit to establishing a local presence. Other than that, a vendor's location is irrelevant to the evaluation of its proposal; the LLO Form points are worthless.

But, once again, the RFP's and LLO Form's language betrays the City's position. The RFP requires bidders to submit the LLO Form. RFP § 6.5.3, ECF No. 9-1 at PAGEID # 137. And the LLO Form states that it will be used in the

---

[7] For Bird's past performance, the 10-point "Past Performance" criterion might appear to be a natural candidate. But the Court finds nothing in the description of that criterion to suggest that it extends to affiliated companies.

evaluation process[8] and purports to award points, like those awarded for the criteria listed in Section 7 of the RFP. *Id.* The City implicitly concedes that it did not count Spin's LLO Form points. The City therefore bound itself but then neglected to consider the LLO Form. This neglect (like consideration of unannounced criteria) may constitute an abuse of discretion. *See Associated Builders*, 926 N.E.2d at 606. So, the Court concludes, Spin's allegation that the City discounted Spin's LLO Form points raises another "serious question going to" the City's abuse of discretion.

Having identified serious questions going to whether the City abused its discretion in rejecting Spin's bid, the Court holds that Spin makes a strong enough showing on the likelihood-of-success factor to support a TRO. The Court turns now to the immediate and irreparable injury factor.

**B.      Spin Will Suffer an Irreparable Injury Without an Injunction Because it Cannot be Compensated with Monetary Damages.**

Spin advances multiple theories of irreparable harm. Many of these theories are based on the expiration of its license to do business in Columbus,

---

[8] Granted, how the LLO Form should have factored into the overall bid analysis is confusing. The LLO Form states that it "will be used to determine the scoring for the location of the lead offeror per Evaluation Criteria Section 7.1 of this Request for Proposal (RFP)." But Section 7.1 sets forth the "Project Team: Qualification and Experience" criterion, which bears, at best, a loose relation to the location of the lead offeror. The description of that criterion says "[p]roposals should provide a commitment to establishing a local presence or office if not already established." But the description does not mention the LLO Form—much less explain how points awarded there affect points awarded for the Project Team criterion. At bottom, a reasonable bidder would understand this form to be an evaluation criterion. And the City cannot, in any event, hide behind the confusing relationship between the LLO Form and the Project Team criterion at this stage of the litigation.

Case No. 2:24-cv-4290                                                    Page 17 of 21

set to take effect on December 31, 2024. Spin fears that the expiration of its license will not only depress its revenue, but also deplete its market presence, sap customer goodwill, and force it to terminate employees. Mot. 9–10, ECF No. 3 at PAGEID # 71–71.

Courts in the Sixth Circuit routinely find these kinds of injuries to be "irreparable" even though they are economic. *See, e.g.*, *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 279–80 (6th Cir. 2015) (loss of market presence); *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511–12 (6th Cir. 1992) (loss of customer goodwill); *NACCO Materials Handling Grp., Inc. v. Toyota Materials Handling USA, Inc.*, 246 F. App'x 929, 943–44 (6th Cir. 2007) (loss of specialized employees); *see also Lane Shark USA, LLC v. Titan Implement, LLC*, No. 1:19-cv-326, 2020 WL 13888633, at *5 (E.D. Tenn. Nov. 30, 2020) (collecting cases). This Court follows suit, finding Spin's fears to be empirically valid and imminent enough to support a TRO.

Spin gestures at a non-economic injury as well: the alleged unfairness of the competitive bidding process. Mot. 10, ECF No. 3 at PAGEID # 72 ("A disappointed bidder is injured by an illegal or improper competitive bidding process."). The Court finds that this, too, is likely an irreparable injury. *Cf. Doe v. Univ. of Cincinnati*, 872 F.3d 393 (6th Cir. 2017) (finding irreparable injury based on threat to due process right).

What is more, Spin cannot be compensated with monetary damages. Under Ohio law, a rejected bidder may not pursue monetary damages for harm

stemming from the rejection of their bid. *Cementech, Inc. v. City of Fairlawn*, 849 N.E.2d 24, 27 (Ohio 2006) ("a rejected bidder is limited to injunctive relief").[9] The unavailability of monetary damages to remedy an injury provides an independent ground for categorizing that harm as "irreparable." *See Tennessee v. Becerra*, 117 F.4th 348, 368 (6th Cir. 2024) ("A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." (quoting *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002))). This rule confirms Spin's harm is irreparable.

**C.    A TRO Will Not Harm Veo or Any Other Specific Third Party.**

Whether the TRO would cause substantial harm to others is a fact-based inquiry. *Curtis 1000, Inc. v. Martin*, 197 F. App'x 412, 426 (6th Cir. 2006) (citing *Parker v. USDA*, 879 F.2d 1362, 1367 (6th Cir. 1989)). The City cautions that a TRO will harm Veo, without explaining how. The Court doubts that a TRO enjoining the City from stopping Spin's operations would affect Veo at all, especially because the TRO will not undo the City's contract with Veo . A TRO would last for only 14 days past what would have been the expiration of Spin's license (28 days if the Court grants an extension). No matter what, a TRO could not extend past January. Veo apparently intends to launch its Columbus

---

[9] The reasons for this rule are sound. Permitting monetary damages in disappointed bidder cases would thwart the main purpose of the competitive bidding process— protecting the taxpayer from excessive costs—by foisting disappointed bidders' economic losses onto taxpayers. *Id.* The alternative (injunctive relief) adequately ensures the integrity of the competitive bidding process at a much lower cost. *Id.* These policy considerations support the availability of injunctive relief here.

operations two months after that (in March).  Based on this timeline, the Court

does not expect that Veo will lose any business because of a TRO.  Seeing no

other potential harm, the Court finds that this factor favors Spin.

**D.    The Public Interest in Continuous Micromobility Operations and in the Integrity of the Competitive Bidding Process Support a TRO.**

The public has an interest in publicly available micromobility.  *See, e.g.*,

*Chef's Warehouse Midwest, LLC v. CSX Transp., Inc.*, No. 1:17-cv-555, 2017

WL 3872484, at *6 (S.D. Ohio Sept. 5, 2017) (emphasizing "the general public's

interest in reliable and safe transportation").  Spin stresses (and the City does not

deny) that, absent an injunction, there will be no publicly available e-scooters

from January 1, 2025, until March 2025 (at the earliest).  Spin informs that it

could easily continue its current operations during the injunction, however.  The

public's interest in transportation thus aligns with a TRO.

The public interest also favors an upright competitive bidding process.

*See Danis*, 653 N.E.2d 646 at 656 (listing "the prevention of corrupt practices"

and "the assurance of open and honest competition in bidding for public

contracts so as to save the public, as well as bidders themselves from any kind

of favoritism, fraud or collusion" among the purposes of competitive bidding law).

The Court has serious questions about the integrity of this competitive bidding

process, as discussed above.  Thus, the public's interest in the competitive

bidding process further justifies a TRO here.

## IV.   CONCLUSION

Having found that all TRO factors favor Spin, the Court concludes that an injunction is warranted.  The Court **ENJOINS** the City from prohibiting Spin's operation in Columbus for 14 days from the entry of this Order.  Spin may continue its micromobility operations as if its permits did not expire.  But the Court's TRO stops there.  This injunction is broad enough to prevent irreparable harm to Spin and ensure the public's continued access to micromobility.  And the injunction is narrow enough to avoid harming Veo and minimize any delay in the City's new SMD program.  With this caveat, the Court **GRANTS** Spin's motion for a TRO.  The Court **DECLINES** to require a bond as it does not appear the TRO could cause any damages to the City.

The TRO shall take effect at _10:00 A. M._ on December 31, 2024, and will expire 14 days later, subject to one extension up to another 14 days. The parties are **ORDERED** to contact the Magistrate Judge and set an expedited schedule for discovery and briefing, and the Court will set PI hearing toward the end of January.  The Court will issue an order at or following the PI hearing either converting the TRO to a PI or ending the TRO.

The Clerk shall terminate ECF No. 3 as a pending motion.

**IT IS SO ORDERED.**

**MICHAEL H. WATSON, JUDGE
UNITED STATES DISTRICT COURT**